Slip Op. 13-106

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **ALBEMARLE CORP.,**<br><br>Plaintiff,<br><br>and<br><br>**NINGXIA HUAHUI ACTIVATED CARBON CO., LTD.,**<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>**UNITED STATES**,<br><br>Defendant,<br><br>and<br><br>**CALGON CARBON (TIANJIN) CO., LTD., CALGON CARBON CORP. AND NORIT AMERICAS INC.,**<br><br>Defendant-Intervenors. | **Before: Timothy C. Stanceu, Judge**<br><br>**Consol. Court No. 11-00451** |

## OPINION AND ORDER

[Remanding to the U.S. Department of Commerce the final results of an administrative review of an antidumping duty order on certain activated carbon from the People's Republic of China]

Dated:  August 15, 2013

*Jeffrey S. Grimson*, Mowry & Grimson, PLLC, of Washington, DC, for plaintiff Albemarle Corp. and plaintiff-intervenor Ningxia Huahui Activated Carbon Co., Ltd.  With him on the brief were *Kristin H. Mowry*, *Jill A. Cramer*, *Susan Lehman Brooks*, *Sarah M. Wyss*, and *Keith F. Huffman*.

*Gregory S. Menegaz*, deKieffer & Horgan, PLLC, of Washington, DC, for plaintiff Shanxi DMD Corp.  With him on the brief were *John J. Kenkel* and *J. Kevin Horgan*.

*Francis J. Sailer*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for plaintiffs Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Beijing Pacific Activated Carbon Products Co., Ltd. and Cherishmet Inc.  With him on the brief were *Mark E. Prado*, *Andrew T. Shutz*, and *Kavita Mohan*.

*Antonia R. Soares*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With her on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director.  Of counsel on the brief was *Devin S. Sikes*, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

*Craig A. Lewis*, Hogan Lovells U.S. LLP, of Washington, DC, for defendant-intervenor Calgon Carbon (Tianjin) Co., Ltd.  With him on the brief was *Hrishikesh N. Hari*.

*David A. Hartquist*, Kelley Drye & Warren LLP, of Washington, DC, for defendant-intervenors Calgon Carbon Corp. and Norit Americas Inc.  With him on the brief were *R. Alan Luberda* and *John M. Herrmann II*.

Stanceu, Judge: In this consolidated action,[1] three plaintiffs challenge the determination

("Final Results") the International Trade Administration, U.S. Department of Commerce

("Commerce" or the "Department") issued to conclude the third periodic administrative review

of an antidumping duty order on imports of certain activated carbon (the "subject merchandise")[2]

from the People's Republic of China ("China" or the "PRC").  *Certain Activated Carbon from*

---

[1] The actions consolidated under Consol. Court No. 11-00451, *Albemarle Corp. v. United States*, are *Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd. v. United States*, Court No. 11-00468 and *Shanxi DMD Corp. v. United States*, Court No. 11-00475.  Order (Jan. 26, 2012), ECF No. 34.

[2] Activated carbon is a powdered, granular, or pelletized carbon product obtained by heat "activating" various carbon-containing materials, such as wood or coal, with steam or carbon dioxide gas.  *See Notice of Antidumping Duty Order: Certain Activated Carbon From the People's Republic of China*, 72 Fed. Reg. 20,988 (Apr. 27, 2007) ("*Order*").  The activating process removes organic materials and creates a porous inner surface in the material.  *See Certain Activated Carbon from China*, Inv. No. 731-TA-1103, USITC Pub. 3913, at 3 (Apr 2007) (Final) ("*ITC Report*").  Excluded from the scope of the antidumping duty order is "chemically-activated" carbon.  *Order*, 72 Fed. Reg. at 20,988.  Chemically-activated carbon is produced by treating the raw materials with chemicals to achieve a similar result through chemical rather than physical means.  *ITC Report* at 3.  Activated carbon is commonly used in water filtration, food and chemical purification, and emissions filtration.  *Id.*

*the People's Republic of China: Final Results and Partial Rescission of Third Antidumping Duty Administrative Review*, 76 Fed. Reg. 67,142 (Oct. 31, 2011) ("*Final Results*"); Issues & Decision Mem., A-570-904, ARP 3–10 (Oct. 24, 2011) ("Decision Mem.").  The third review covers entries of subject merchandise made between April 1, 2009, and March 31, 2010 (the "period of review" or "POR").

Before the court are three motions for judgment on the agency record brought under USCIT Rule 56.2.  Plaintiff Albemarle Corporation ("Albemarle") is supported in its Rule 56.2 motion by plaintiff-intervenor Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui").  Mot. for J. upon the Agency R. pursuant to Rule 56.2 by Pl. Albemarle Corporation and Intervenor-Pl. Ningxia Huahui Activated Carbon Co., Ltd. (May 18, 2012), ECF No. 43 ("Albemarle Rule 56.2 Mot.").  The two other Rule 56.2 motions are brought by plaintiff Shanxi DMD Corporation ("Shanxi DMD"), and plaintiffs Cherishmet Inc., Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd. ("GHC") and Beijing Pacific Activated Carbon Products Company, Ltd. ("BPAC") (collectively, "Cherishmet"), respectively.  Mot. for J. on the Agency R. (May 18, 2012), ECF No. 42 ("Shanxi DMD Rule 56.2 Mot."); Consol. Pls.' Rule 56.2 Mot. for J. upon the Agency R. (May 18, 2012), ECF No. 44 ("Cherishmet Rule 56.2 Mot.").

Opposing the Rule 56.2 motions are defendant United States and defendant-intervenors Calgon Carbon Corporation and Norit Americas, Inc. (collectively "CCC"), and Calgon Carbon (Tianjin) Co., Ltd. ("CCT").  Def.'s Resp. to Pl.'s, Consol. Pls.', and Pl.-Intervenor's Mots. for J. upon the Agency R. (July 30, 2012), ECF No. 57 ("Def.'s Resp."); Def.-Intervenor's Br. in Resp. to Pls.' Mots. for J. on the Agency R. (July 30, 2012), ECF No. 53 ("CCC's Resp."); Def.-Intervenor Calgon Carbon (Tianjin) Co., Ltd.'s Br. in Opp'n to Pls.' Rule 56.2 Mot. for J. upon the Agency R. (July 30, 2012), ECF No. 56 ("CCT's Resp.").

For the reasons discussed herein, the court will order a remand for reconsideration of certain aspects of the Final Results.

## I. BACKGROUND

### A.  The Parties to the Consolidated Action

Plaintiff Albemarle is a U.S. importer of subject merchandise.  Compl. ¶ 5 (Nov. 18, 2011), ECF No. 6 ("Albemarle Compl."); *Certain Activated Carbon From the People's Republic of China: Prelim. Results of the Third Antidumping Duty Administrative Review, and Prelim. Rescission in Part*, 76 Fed. Reg. 23,978, 23,979 (Apr. 29, 2011) ("*Preliminary Results*").  During the POR, Albemarle imported activated carbon from plaintiff-intervenor Huahui, a Chinese exporter.  Albemarle Compl. ¶ 16; Consent Mot. to Intervene as a Matter of Right as Pl.-Intervenor 1 (Dec. 2, 2011), ECF No. 13 ("Huahui Mot. to Intervene").  Plaintiff Shanxi DMD is also a Chinese exporter of activated carbon.  Compl. ¶ 5 (Dec. 5, 2011), ECF No. 9 (Court No. 11-00475) ("Shanxi DMD Compl.").  Plaintiffs GHC and BPAC are producers and/or exporters of subject merchandise, and plaintiff Cherishmet, Inc. is the U.S. importer affiliate of GHC and BPAC.  Compl. ¶ 3 (Nov. 23, 2011), ECF No. 6 (Court No. 11-00468) ("Cherishmet Compl.").

Defendant-intervenor CCT is a Chinese producer and exporter of activated carbon, and defendant-intervenor CCC, the parent company of CCT, is a domestic activated carbon producer and the petitioner.  Consent Mot. to Intervene as of Right 2 (Dec. 6, 2011), ECF No. 18; Mot. for Leave to Intervene as of Right 2 (Dec. 15, 2011), ECF No. 24; *Final Results*, 76 Fed. Reg. at 67,143.

B.  Procedural History

On April 27, 2007, Commerce issued the antidumping order on certain activated carbon from China.  *Notice of Antidumping Duty Order: Certain Activated Carbon From the People's Republic of China*, 72 Fed. Reg. 20,988 (Apr. 27, 2007).  Commerce initiated the third administrative review of that order on May 28, 2010.  *Initiation of Antidumping & Countervailing Duty Administrative Reviews*, 75 Fed. Reg. 29,976 (May 28, 2010).

Commerce published the preliminary results of the review on April 29, 2011 after selecting Jacobi Carbons AB ("Jacobi") and CCT as the only mandatory respondents, and after identifying India as the primary surrogate country for the purpose of valuing the factors of production ("FOPs").  *Preliminary Results*, 76 Fed. Reg. at 23,981.  Commerce determined a preliminary margin of $0.05 per kilogram for CCT and a preliminary *de minimis* margin for Jacobi.  *Id.*  Commerce also preliminarily assigned a margin of $0.05 per kilogram ("$/kg") to the unexamined respondents who had demonstrated entitlement to a rate that was separate of that assigned to the PRC entity (the "separate rate" respondents), which included Huahui, Shanxi DMD, BPAC, and GHC.  *Id.*

In the Final Results, issued October 31, 2011, Commerce determined *de minimis* margins for both mandatory respondents, Jacobi and CCT.  *Final Results*, 76 Fed. Reg. at 67,145.  Huahui was assigned a margin of $0.44/kg, the margin Commerce assigned to it in the previous (second) administrative review of the order, while the other separate rate respondents were assigned a margin of $0.28/kg, the rate Commerce assigned to the separate rate respondents in the previous review.  *Id.*

## II.  DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980,

28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced under section

516A of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1516a(a)(2)(B)(iii), including an

action contesting the Department's issuance, under section 751 of the Tariff Act, 19 U.S.C.

§ 1675(a), of the final results of an administrative review of an antidumping duty order.[3]  In

reviewing the final results, the court will hold unlawful any finding, conclusion, or determination

that is not support by substantial evidence on the record or that is otherwise not in accordance

with law.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

### B.  Claims Asserted in this Litigation

There are four claims in this consolidated action.  First, both Albemarle and Shanxi DMD

challenge the Department's valuation of CCT's coal-based carbonized materials using Indian

Harmonized Tariff Schedule ("Indian HTS") subheading 4402.90.10, "Coconut Shell Charcoal."

Mem. of P. & A. in Supp. of Rule 56.2 Mot. for J. on the Agency R. by Pl. Albemarle Corp. and

Intervenor-Pl. Ningxia Huahui Activated Carbon Co., Ltd. 11, 19-23 (May 21, 2012), ECF

No. 45 ("Albemarle Rule 56.2 Mem."); Pl.'s Rule 56.2 Mem. in Support of Mot. for J. upon the

Agency R. 2-3 (May 18, 2012), ECF No. 42-2 ("Shanxi DMD Rule 56.2 Mem.").  Second,

Albemarle challenges the Department's valuation of CCT's "coal and fines" by-products,

claiming this valuation is unlawful because it is based on findings unsupported by substantial

evidence and, contrary to Department policy, is significantly higher than the Department's

surrogate value for the coal-based carbonized materials.  Albemarle Rule 56.2 Mem. 15-18.

---

[3] Unless otherwise indicated, all statutory citations herein are to the 2006 edition of the U.S. Code and all citations to regulations are to the 2011 edition.

Third, Albemarle challenges the $0.44/kg margin that Commerce assigned to Huahui in the Final

Results, while Shanxi DMD and Cherishmet challenge the Department's assignment of a

$0.28/kg "separate rate" margin to Shanxi DMD, BPAC and GHC, respectively.[4]  Albemarle

Rule 56.2 Mem. 24-29; Shanxi DMD Rule 56.2 Mem. 8-17; Brief in Supp. of Consol. Pls.' Rule

56.2 Mot. for J. upon the Agency R. 14-18 (May 18, 2012), ECF No. 44 ("Cherishmet Rule 56.2

Mem."). Fourth, Shanxi DMD claims that Commerce erred in assigning it a specific, *i.e.*, U.S.

dollar per kilogram, assessment and cash deposit rate rather than an *ad valorem* rate.  Shanxi

DMD Rule 56.2 Mem. 17-25.

As discussed herein, the court decides that on remand Commerce must reconsider (1) the

surrogate values it determined for carbonized materials and coal and fines by-products; (2) the

rate it assigned to certain separate-rate respondents who are parties to this litigation; and (3) its

decision to use a per-unit rather than an *ad valorem* rate for the cash deposit and assessment rates

applicable to Shanxi DMD.

C.  On Remand, Commerce Must Reconsider the Surrogate Values for CCT's Carbonized
Materials and Coal and Fines By-Products

When determining the normal value of subject merchandise from a nonmarket economy

country such as China, Commerce, applying section 773(c)(1) of the Tariff Act, ordinarily

determines "surrogate" values for "the factors of production utilized in producing the

merchandise" and does so "based on the best available information regarding the values of such

factors in a market economy country or countries" that Commerce considers appropriate.

---

[4] The separate-rate claim is the only claim plaintiffs Cherishmet Inc., Ningxia Guanghua
Cherishmet Activated Carbon Company, Ltd. ("GHC") and Beijing Pacific Activated Carbon
Products Company, Ltd. ("BPAC") (collectively, "Cherishmet") asserted in their Rule 56.2
motion.  Consolidated Pls.' Rule 56.2 Mot. for J. upon the Agency R. (May 18, 2012), ECF No.
44.  Other claims asserted in Cherishmet's complaint are not addressed in the motion and
therefore are abandoned.  Compl. ¶¶ 15-19 (Nov. 23, 2011), ECF No. 6 (Court No. 11-00468).

19 U.S.C. § 1677b(c)(1).  The surrogate values Commerce determined for CCT's use of

coal-based "carbonized material" in producing subject merchandise, and for CCT's "coal and

fines" by-products derived from processing the coal-based carbonized material, are at issue in

this litigation.  Defendant has submitted voluntary remand requests under which Commerce

would reconsider both surrogate values, which requests CCT opposes.  For the reasons discussed

below, the court will order Commerce to reconsider both surrogate values.

### 1.  The Surrogate Value for CCT's Coal-Based Carbonized Material

Carbonized material, the principal material used in producing activated carbon, consists

of "most any solid material that has a high carbon content," including "coal, wood, coconut

shells, olive stones, and peat."  *Certain Activated Carbon from China*, Inv. No. 731-TA-1103,

USITC Pub. 3913, at I-5 (Apr. 2007) (Final).  Coal is the material most commonly used in

producing activated carbon in the United States and China.  *Id.*

In the Preliminary Results, Commerce calculated the surrogate value of CCT's

coal-based carbonized material using Global Trade Atlas ("GTA") import data for Indian HTS

subheading 2704.00.90, "Other Cokes of Coal," which yielded an average unit value ("AUV")

of 13,865.83 Rupees per metric ton ("Rs/MT").  *Decision Mem.* 14; *Mem. from Int'l Trade

Specialist to the File* 2 (Apr. 22, 2011) (Admin.R.Doc. No. 2138).  In the Final Results,

Commerce substantially reduced its surrogate value to 3,796.54 Rs/MT, which reflected an AUV

Commerce obtained from GTA import data for Indian HTS subheading 4402.90.10, "Coconut

Shell Charcoal," submitted by Jacobi.  *Letter from Jacobi to the Sec'y of Commerce* Ex. 1 (May

19, 2011) (Admin.R.Doc. No. 2164).

Commerce changed its decision in response to comments that mandatory respondent

Jacobi, who is not a party to this action, submitted to Commerce in a case brief.  In that brief,

Jacobi argued that "[t]he Department should value Jacobi's use of carbonized materials using coconut shell charcoal classified under HTS 4402.90.10 because 'other cokes of coal' is not used to produce activated carbon." *Letter from Jacobi to the Sec'y of Commerce* 1 (June 14, 2011) (Admin.R.Doc. No. 2204) ("*Jacobi Case Br.*").  Citing the Department's Draft Remand Determination for the first administrative review of the Order,[5] Jacobi argued, further, that "coconut shell charcoal shares similar properties with carbonized material," namely, "porosity and adsorption," and that "those similar properties are essential in the production of activated carbon." *Id.* at 3-4 (citation omitted).

Agreeing with Jacobi's argument, Commerce valued both Jacobi's and CCT's carbonized materials using import statistics for Indian HTS subheading 4402.90.10 ("Coconut Shell Charcoal") and the associated AUV of 3,796.54 Rs/MT.  *Decision Mem.* 14.  Citing the Department's Final Remand Redetermination for the first administrative review of the Order, Commerce found that "Other Cokes of Coal" was not specific to substances that are carbonized, and that the subheading for "Coconut Shell Charcoal" is more product-specific because it pertains to a material with properties of adsorption and porosity similar to those of carbonized material and essential in the production of subject merchandise.  *Id.* at 14-15 (citing *Final Remand Redetermination in the First Administrative Review* 10-11 (July 26, 2011) (Consol. Court No. 09-00524)).[6]  Commerce also noted that the coconut shell charcoal import data were

---

[5] The Department's Draft Remand Determination in the first administrative review of the Order on certain activated carbon from the People's Republic of China was issued pursuant to this Court's Opinion and Order in *Calgon Carbon Corp. v. United States*, 35 CIT __, Slip Op. 11-21 (Feb. 17, 2011).

[6] In *Hebei Foreign Trade and Advertising Corp. v. United States*, 35 CIT __, __, 807 F. Supp. 2d 1317, 1319 (Oct. 24, 2011), this Court sustained the redetermination of the surrogate value for carbonized material value in the first administrative review, *id.* at n.2.

contemporaneous with the POR and exclusive of tax and duty, consistent with the Department's

preferences when selecting surrogate values.  *Id.* at 14.

Albemarle and Shanxi DMD claim that the Department's revised surrogate value cannot

be sustained because there is no record evidence to support a finding that the determination was

based on the best available information.  Albemarle Rule 56.2 Mem. 19-23; Shanxi DMD

Rule 56.2 Mem. 2-3.

At oral argument held on December 13, 2012, the court noted that the record as filed by

Commerce appeared to lack the evidence on which Commerce relied in determining its surrogate

value for carbonized materials, specifically, the evidence on which the Department relied in the

Final Remand Redetermination in the First Review.  Oral Tr. 87-88 (Dec. 13, 2012), ECF

No. 84.  Defendant agreed to submit the missing materials, and the court entered an order with

dates for that submission and for submission of additional briefing by the parties on the

carbonized material surrogate value issue.  Order (Dec. 12, 2012), ECF No. 73.  Rather than

submit additional record materials in accordance with the order, defendant moved for a voluntary

remand, under which Commerce would reconsider its surrogate value for CCT's carbonized

material input and also submit the missing record materials.  Def. Mot. for a Voluntary

Remand 2-3 (Dec. 19, 2012), ECF No. 74.  Defendant stated as its reason for requesting a

voluntary remand that, the court having ordered the completion of the administrative record, "the

proper course of action at this point is for the Government to seek a voluntary remand to place

the evidence on the administrative record and for the agency to accept comments from the parties

regarding the evidence and to address those comments in a remand."  *Id.* at 2.  Defendant,

accordingly, requested that "the Court vacate its December 13, 2012 order to the extent that it

requires the agency to supplement the record with the evidence related to the surrogate value for

carbonized material," and that "[i]n the instant proceeding, Commerce [] be allowed to place the

evidence on the record and consider comments from the parties in the first instance." *Id.*

        CCT filed a response in opposition to defendant's voluntary remand motion.

Def.-Intervenor Calgon Carbon (Tianjin) Co., Ltd.'s Resp. in Opp'n to Def.'s Mot. for Voluntary

Remand (Dec. 20, 2012), ECF No. 75 ("CCT's Opp'n to Def.'s Mot.").   CCT argued that a

voluntary remand on the Department's valuation of its carbonized materials is inappropriate

because the court, by requesting that Commerce supplement the record submitted, "has already

fashioned the appropriate procedure to address the carbonized material claims" and "it is not the

proper role of this Court to effectively delegate to Commerce to decide, after the fact, whether its

contested final decision was supported by substantial evidence." *Id.* at 1, 4.   CCT also argued

that plaintiffs' claims regarding the surrogate value of CCT's carbonized material input "should

be dismissed on exhaustion grounds pursuant to 28 U.S.C. § 2637(d)" because no party before

Commerce commented in opposition to Jacobi's advocating a change from Indian HTS

subheading 2704.00.90, "Other Cokes of Coal," to Indian HTS subheading 4402.90.10,

"Coconut Shell Charcoal," for valuation of CCT's carbonized material input. *Id.* at 2; CCT's

Resp. 15-16.

        An agency generally should be allowed a voluntary remand to reconsider its position

provided that "the agency's concern is substantial and legitimate." *SKF USA Inc. v. United

States*, 254 F.3d 1022, 1028-30 (Fed. Cir. 2001).   Here, however, the rationale defendant put

forth to explain the basis for the Department's concern is opaque.   Reconsideration of the

carbonized material surrogate value does not necessarily follow merely from the fact that the

agency erred in failing to include in the administrative record submitted to the court the evidence

on which it relied.   Defendant offers no reason related to the merits of the decision it wants

Commerce to have the opportunity to reconsider, nor does defendant provide a convincing

explanation of why the order the court issued upon oral argument is not sufficient.  That order

directed the completion of the record and allowed the parties to submit briefing that may address

the additional evidence.  In this respect, CCT's objection to the voluntary remand request has

some merit.  However, the court finds reasons to order reconsideration of the carbonized material

surrogate value despite the shortcomings in defendant's motion.

Although sparse in its justification, defendant's motion indicates at least that Commerce

desires to reconsider its decision, thus placing CCT in the unfavorable posture of taking a

position on a voluntary remand request that is contrary to the current position of defendant

United States, the party on whose behalf CCT has intervened.  Furthermore, as discussed later in

this Opinion and Order, the court sees a need for a remand on the other surrogate value at issue

in this case, which pertains to coal and fines by-products.  As the court explains, the two

surrogate value issues are related with respect to an assertion that the Department has a policy of

disfavoring valuations for downstream by-products that exceed those of the upstream material

input.

Finally, the court does not find merit in CCT's objection grounded in the requirement to

exhaust administrative remedies.  As CCT concedes, whether and how the exhaustion

requirement is applied is a matter for the court's discretion.  CCT's Resp. 15; 28 U.S.C.

§ 2637(d) ("the [court] shall, where appropriate, require the exhaustion of administrative

remedies."); *Corus Staal BV v. United States*, 502 F.3d 1370, 1379-80 (Fed. Cir. 2007) (stating

that "applying exhaustion principles in trade cases is subject to the discretion of the judge of the

Court of International Trade").  Here, the Department's change in position on the carbonized

material surrogate value was announced in the Final Results, after the submission of case briefs.

*See Decision Mem.* 14; 19 C.F.R. § 351.309(c)(2) (requiring a party to submit a case brief

"present[ing] all arguments that continue in [its] view to be relevant to [the Department's] final

determination or final results").

<u>2.  The Surrogate Value for CCT's Coal and Fines By-Products</u>

In the Preliminary Results, Commerce determined that CCT was eligible for by-product

offsets for "non-activated by-products, such as pressroom powder and non-activated fines."

*Preliminary Results*, 76 Fed. Reg. at 23,989.  CCT submitted proposed surrogate value

information based on Indian HTS data, which Commerce accepted, resulting in a surrogate value

for its "coal by-product" of 4,860.88 Rs/MT and a surrogate value for its "fines by-product" of

11,319.90 Rs/MT.[7]  *Mem. from Case Analyst to the File* 5, Ex. 1 (Apr. 22, 2011) (Admin.R.Doc.

No. 2144).  No party having objected to or commented on these determinations, Commerce left

these two by-product surrogate values unchanged in the Final Results.  *Decision Mem.* 1-2.  As a

result, the Decision Memorandum did not address issues pertaining to these surrogate values.  *Id.*

Albemarle claims that the by-product surrogate value determinations are unsupported by

substantial evidence and run counter to agency policy "because they result in an unreasonable

and inappropriate inversion" in which the downstream by-products are valued considerably

higher than the upstream carbonized material.  Albemarle Rule 56.2 Mem. 3-4, 15.  Pointing to

the Department's revised surrogate value of 3,796.54 Rs/MT for carbonized materials,

Albemarle argues that Commerce should correct the value inversion by reverting to Indian HTS

subheading 2704.00.90, "Other Cokes of Coal," with a value of 13,865.83 Rs/MT, to value

---

[7] According to Calgon Carbon (Tianjin) Co., Ltd ("CCT"), the fines by-product "is subject merchandise that is simply smaller in size and thus is generally not sold to customers, but instead is recycled and used by CCT to produce subject merchandise."  *Letter from CCT to the Sec'y of Commerce: CCT Sections C and D Questionnaire Resp.* 19 (Pub. Version) (Nov. 23, 2010) (Admin.R.Doc. No. 2018) (Section D, Factors of Production Resp.).

CCT's carbonized material input, as was done in the Preliminary Results. *Id.* at 18. Defendant, while not confessing error, seeks a voluntary remand so that Commerce may reconsider the surrogate values it assigned to CCT's coal and fines by-products. Def.'s Resp. 19-20.

CCT seeks to raise various arguments against defendant's request for a voluntary remand and moves for the filing of its brief in opposition. Def.-Intervenor Calgon Carbon (Tianjin) Co., Ltd.'s Mot. for Leave to File Resp. in Opp'n to Def.'s Req. for Voluntary Partial Remand 3 (Sept. 25, 2012), ECF No. 67 ("CCT's Opp'n to Def.'s Remand Request"). No party having objected to CCT's motion to file its brief, the court grants CCT's motion and deems the accompanying brief filed as of September 25, 2012. The court, however, does not agree with the arguments CCT puts forth.

CCT opposes defendant's remand request on the grounds that (1) Albemarle did not exhaust its administrative remedies on the issue of surrogate values for coal and fines by-products; (2) defendant has offered no reason for requesting a remand; (3) a remand is not warranted unless error is shown; and (4) a voluntary remand would further delay and complicate the court's proceedings, causing a delay of at least the 60 days for the requested remand and complicating the court's appellate review "such that the Court likely would have to deal with two different determinations by the Department (the original final results and the remand results)." CCT's Opp'n to Def.'s Remand Request 2-5. The court is not persuaded by these arguments and will order a remand in response to defendant's request.

As discussed *supra*, decisions pertaining to exhaustion of administrative remedies are matters for the court's discretion. Here, the court does not consider it appropriate to dismiss Albemarle's challenge to the by-product surrogate values for failure to exhaust. The ground on which Albemarle brings that challenge—a value inversion relative to the value of carbonized

material—did not become apparent until issuance of the Final Results, when Commerce

announced that it had changed its surrogate value for the carbonized material based on the

argument made by Jacobi.

The court also disagrees with CCT's assertion that defendant offered no reason for

seeking a remand.  In requesting the remand, defendant stated as follows:

> Albemarle and Huahui contend that the surrogate values currently assigned to the
> coal and fine by-products do not constitute the best information available for these
> factors of production and that Commerce's determination runs counter to agency
> practice.  Upon reviewing plaintiffs' motion and without confessing error, we
> respectfully request a partial remand for Commerce to reexamine the values
> assigned to the by-products.

Def.'s Resp. 19-20 (citations omitted).  The court reasonably may infer from the quoted language

that Commerce wishes to reconsider its surrogate values in light of the arguments put forth by

Albemarle, including the argument that the "value inversion" is contrary to the Department's

practice.

CCT's third argument, that a remand is not appropriate unless error is shown, is not a

correct statement of the law.  An agency need not confess error to obtain a voluntary remand.

*SKF*, 254 F.3d at 1029.

CCT's final objection is also without merit.  Although a voluntary remand takes some

time, it carries the potential of saving time in that it might avoid a remand later in the proceeding.

The objection that the voluntary remand would complicate the proceeding by requiring the court

to deal with two decisions is not a valid one, as the agency either will reach the same decision on

remand that it reached before or it will reach a different one.  In either event, only one decision

will be before the court.

D.  On Remand, Commerce Must Reconsider Its Separate Rate Methodology as Applied to
Unexamined Respondents Shanxi DMD and BPAC and GHC

Albemarle challenges the $0.44/kg margin that Commerce assigned to Huahui in the

Final Results, which was based on Huahui's individual rate in the previous (second)

administrative review.  Albemarle Rule 56.2 Mem. 4.  Albemarle argues that "[i]t makes no

sense for Commerce to consider older rates to reasonably reflect margins for the current period

while at the same time rejecting current rates as not representative of the dumping margins of the

separate rate companies."  Albemarle Rule 56.2 Mem. 29.

Both Shanxi DMD and Cherishmet contest the Department's assignment of a $0.28/kg

margin, which was based on the "separate rate" calculated in the second review, to unexamined

respondents Shanxi DMD and BPAC and GHC, respectively.  Shanxi DMD Rule 56.2 Mem. 2;

Cherishmet Rule 56.2 Mem. 2.  Shanxi DMD contends that the rate is unreasonable because

Commerce "failed to establish why past data is [*sic*] more relevant than current data of

mandatory respondents."  Shanxi DMD Rule 56.2 Mem. 15.  Similarly, Cherishmet challenges

the $0.28/kg margin assigned to BPAC and GHC on the ground that "the Department has

presented no evidence or reason for diverting from the well-established premise that the Final

Results of a proceeding should be based solely on the facts on the record *in that proceeding*."

Cherishmet Rule 56.2 Mem. 14, 16.  Albemarle, Shanxi DMD, and Cherishmet request that the

issue be remanded to Commerce so that Commerce may reconsider the margins applied to

unexamined respondents Huahui, Shanxi DMD, and BPAC and GHC, respectively.

When Commerce limits the number of individually examined respondents in an

administrative review, as it did here, it must establish a rate for the remaining cooperative, but

unexamined, respondents who have demonstrated eligibility for a separate rate.  The Tariff Act

does not address how Commerce must calculate this separate rate.  However, in an investigation,

section 735(c)(5) of the Tariff Act directs Commerce, initially, to determine the separate rate by

weight-averaging the individual rates calculated for the investigated respondents, excluding *de*

*minimis* or zero rates and rates based on facts available.  19 U.S.C.§ 1673d(c)(5)(A).  If, pursuant

to section 735(c)(5)(A), all individually investigated respondents' dumping margins are zero, *de*

*minimis*, or based on facts available, section 735(c)(5)(B) directs Commerce to "use any

reasonable method to establish the estimated all others rate for exporters and producers not

individually investigated, including averaging the estimated weighted average dumping margins

determined for the exporters and producers individually investigated."  *Id.* § 1673d(c)(5)(B).

Because Congress has not given explicit instructions for calculating the separate rate in periodic

administrative reviews, Commerce has a measure of discretion in determining what methodology

to employ.  This discretion is not unlimited, however, and Commerce must "articulate a

satisfactory explanation" for its choice of methodology.  *Yangzhou Bestpak Gifts & Crafts Co.,*

*Ltd. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013) ("*Bestpak*").

     In the Preliminary Results, Commerce noted that Huahui, Shanxi DMD, BPAC, and

GHC were among eight firms who met the criteria for separate rate status.  *Preliminary Results*,

76 Fed. Reg. at 23,979.  Commerce assigned the qualifying separate rate respondents a rate of

$0.05/kg based on the rate calculated for CCT.  *Id.* at 23,990.  Commerce did not include in the

separate rate calculation the *de minimis* margin assigned to Jacobi.  *Id.*  In the Final Results,

Commerce assigned a *de minimis* margin to both Jacobi and CCT.  *Final Results*, 76 Fed. Reg.

at 67,145.  Commerce assigned Huahui the same margin it determined in the second review, *i.e.*,

$0.44/kg, because Huahui was individually examined in that review.  *Decision Mem*. 4, 7.

Commerce assigned the separate rate respondents other than Huahui a $0.28/kg margin that also

was based on the previous (second) administrative review.  *Id.* at 4-7.  This margin was the

margin Commerce calculated for the unexamined respondents in the second review, which Commerce had calculated as a simple average.  *Id.*

Noting that the statute is silent on the method to be employed, the Decision Memorandum submits that the Department's method of determining a rate for the separate rate respondents (other than Huahui) is "reasonable" because it represents a "contemporaneous examination of individually-reviewed respondents exclusive of zero, *de minimis* and facts available margins, and reasonably reflects potential dumping margins for the non-selected companies."  *Id.* at 5.  Further, the Decision Memorandum reasons that the Department's methodology is appropriate because there is no record evidence to determine whether Jacobi and CCT's pricing behavior in the POR for the third review was representative of that of the separate rate companies.  *Id.*

The court concludes that Commerce must reconsider the margin it assigned to Shanxi DMD, BPAC, and GHC.  The $0.28/kg margin was not based on data pertaining to any pricing behavior that occurred in the third POR.  Nor was it based on any data pertaining to these respondents; instead, Commerce reverted to a margin it determined in *another* review for *other* respondents.  This margin does not reflect commercial reality with respect to Shanxi DMD, BPAC, and GHC and is, in that sense, arbitrary.  The Department's statement that this margin is based on a "contemporaneous examination of individually-reviewed respondents exclusive of zero, *de minimis* and facts available margins, and reasonably reflects potential dumping margins for the non-selected companies," *Decision Mem.* 5, is factually incorrect when viewed in the context of the record evidence of the third review.  There is nothing "contemporaneous" about the margin, and, having no factual relationship to the pricing behavior of the respondents who received it, the $0.28/kg margin cannot be said to "reasonably reflect potential dumping

margins" in the third POR.  Moreover, the Department's decision is not justified by its rationale,

as stated in the Decision Memorandum, that that there was no record evidence with which to

determine whether Jacobi and CCT's pricing behavior in the third POR was representative of

that of the separate rate companies.  There is no record evidence to support a finding or a

reasonable inference that the $0.28/kg margin was representative of the separate rate companies'

pricing behavior in the third POR.  While the *de minimis* margins assigned to Jacobi and CCT at

least reflect commercial realities prevailing in the pertinent POR, the same cannot be said for the

margin Commerce assigned to Shanxi DMD, BPAC, and GHC.

   The Department's overriding purpose in administrating the antidumping laws must be "to

calculate dumping margins as accurately as possible."  *Bestpak*, 716 F.3d at 1379; *see also SNR*

*Roulement v. United States*, 402 F.3d 1358, 1363 (Fed. Cir. 2005) ("Antidumping laws intend to

calculate antidumping duties on a fair and equitable basis.").  Commerce selected Jacobi and

CCT as the mandatory respondents because it found that these two respondents were the largest

producer/exporters of subject merchandise during the POR.[8]  In this respect, the *de minimis*

margins must be considered more representative of industry-wide pricing behavior during the

POR than the $0.28/kg calculation from the previous review, which bears no rational relationship

to the POR.  Commerce ordinarily gives considerable weight to the contemporaneity of data

when conducting periodic administrative reviews.  S*ee Decision Mem.* 13.  As shown by a

comparison with the Preliminary Results, the apparently controlling reason Commerce did not do

---

   [8] Commerce asserted these facts in its respondent selection memoranda.  *See Mem. to the*
*File (Selection of Resp'ts for Individual Review)* 6 (Pub. Version) (July 21, 2010) (Admin.R.Doc.
No. 1873) (selecting Jacobi Carbons AB as a mandatory respondent and stating that Jacobi "is
either the largest or second largest exporter by volume of total U.S. entries during the POR of
certain activated carbon from the PRC under review."); *Mem. to the File (Selection of Additional*
*Mandatory Resp't)* 5 (Pub. Version) (Sept. 29, 2010) (Admin.R.Doc. No. 1928) (selecting CCT
as a mandatory respondent and stating that "the largest producer/exporter is CCT.").

so here was that the margins Commerce assigned to the mandatory respondents in the Final

Results were *de minimis*.

Defendant argues that the margin Commerce assigned to the separate rate respondents

was permissible because Commerce has "broad discretion to select any reasonable

methodology." Def.'s Resp. 21. Defendant is correct that Commerce may exercise considerable

discretion in assigning a margin to the separate rate respondents in a review; however, the court

disagrees that the margin Commerce chose was permissible. Where, as here, Commerce actually

examined the sales of what it considered to be the two most representative respondents in the

POR, and no others, that discretion does not permit the arbitrary assignment of a margin that has

no rational relationship to any pricing behavior during the POR or to the likely pricing behavior

of the recipients of the margin.

Defendant also points to the Department's finding that there were no data on the record to

determine whether the separate rate respondents' pricing behavior was comparable to that of the

examined respondents during the third administrative review, arguing that this finding supports

the conclusion that the rates calculated during the second review are the most reliable on the

record. *Id*. at 29 (citing *Decision Mem.* 6). Defendant further argues that the separate rate

respondents who are plaintiffs in this case have never been assigned a *de minimis* margin and

therefore are not entitled to one here. *Id*. at 29. These arguments impliedly acknowledge that the

only reason Commerce changed its methodology from the Preliminary Results was the fact that

both mandatory respondents received a *de minimis* margin. These arguments are unpersuasive

because there are no record data about the pricing behavior of the separate rate respondents in the

third review from which it could be reasonably inferred that the margin would, or would not, be

a *de minimis* margin. Moreover, the state of the record is not the fault of the separate rate

respondents.  The available data pertaining to the POR for the third review were limited by the

Department's decision to individually examine only two mandatory respondents.  *See Mem. to*

*the File (Selection of Resp'ts for Individual Review)* 6 (July 21, 2010) (Admin.R.Doc. No. 1873)

(selecting Jacobi as a mandatory respondent); *Mem. to the File (Selection of Additional*

*Mandatory Resp't)* 5 (Sept. 29, 2010) (Admin.R.Doc. No. 1928) (selecting CCT as a mandatory

respondent).  Commerce made this decision despite its general statutory obligation to examine all

respondents for which a review was requested.  *See* 19 U.S.C §§ 1675(a); 1677f-1(c)(2)

(providing only a narrow exception where Commerce is authorized to limit the number of

individually examined respondents "[i]f it is not practicable to make individual weighted average

dumping margin determinations . . . because of the large number of exporters or producers

involved in the . . . review.").[9]  Here, there were eight respondents, including Shanxi DMD,

BPAC, and GHC, who qualified for a separate rate.

  The margin Commerce assigned to Huahui, like the margin assigned to the other

plaintiffs, was not based on sales during the POR.  However, unlike those margins, it is grounded

---

[9] Paragraph (2) of 19 U.S.C. § 1677f-1(c) provides:

   If it is not practicable to make individual weighted average
   dumping margin determinations under paragraph (1) because of the
   large number of exporters or producers involved in the
   investigation or review, the administering authority may determine
   the weighted average dumping margins for a reasonable number of
   exporters or producers by limiting its examination to—

    (A) a sample of exporters, producers, or types of products
    that is statistically valid based on the information available
    to the administering authority at the time of selection, or

    (B) exporters and producers accounting for the largest
    volume of the subject merchandise from the exporting
    country that can be reasonably examined.

19 U.S.C. § 1677f-1(c)(2).

in actual sales by Huahui, albeit sales during the previous (second) POR.  The court reserves any

decision on whether the margin assigned to Huahui was permissible.  Commerce may or may not

decide to assign Huahui a different margin based on other decisions it makes upon remand, and

this Opinion and Order does not preclude Commerce from reconsidering the $0.44/kg margin

assigned to Huahui in the Final Results.  The court will consider this question anew upon

reviewing the remand redetermination required by this Opinion and Order.

       Defendant-intervenor CCC argues that the Department's methodology is permissible

because "[p]laintiffs have not demonstrated with substantial evidence that assigning them a zero

average margin would be reasonable, when none of the Plaintiffs has ever had a zero margin

before" and that plaintiffs have not met their burden of "establish[ing] that assigning margins

from previous periods—especially for Huahui which received a margin based upon its own data

from the immediately prior review—is inherently unreasonable."  CCC's Resp. 17-18.  CCC also

contends that "each of the Plaintiffs affirmatively sought to participate in the third administrative

review as a separate rate respondent and, therefore, had no expectation of receiving a precisely

calculated, company-specific margin."  *Id*. at 15.

       The court is not persuaded by CCC's arguments as they apply to the $0.28/kg separate

rate margin assigned to Shanxi DMD, BPAC, and GHC.  The court must review the

Department's decision according to the substantial evidence standard of review; it would be

unsound to attempt to shift the evidentiary burden to plaintiffs in the way that CCC suggests.

The implied premise underlying CCC's argument is that Commerce may not assign a *de minimis*

margin to an unexamined respondent unless that respondent demonstrates with record evidence a

reasonable likelihood that it would have received a *de minimis* margin had it actually been

examined.  In determining a margin for unexamined respondents, Commerce is subject to no

such restriction but instead must employ a reasonable method for which it provides a rational

explanation.  *See Bestpak*, 716 F.3d at 1378.

<u>E.  Commerce Must Reconsider its Decision to Apply a Per-Unit Cash Deposit and Assessment
Rate To Shanxi DMD</u>

Under the applicable regulation, Commerce "normally will calculate an assessment rate

for each importer of subject merchandise covered by the review."  19 C.F.R. § 351.212(b)(1).

The regulation states, further, that Commerce "normally will calculate the assessment rate by

dividing the dumping margin found on the subject merchandise examined by the entered value of

such merchandise for normal customs duty purposes."[10]  *Id*.  Thus, the normal method as

prescribed by the regulation results in an *ad valorem* assessment rate.

In the Final Results of the previous (second) review, Commerce deviated from the normal

method by changing "the cash deposit and assessment methodology from an *ad valorem* to a

per-unit basis," thereby stating margins in dollars per kilogram.  *Certain Activated Carbon From

the People's Republic of China: Final Results and Partial Rescission of Second Antidumping

Duty Administrative Review*, 75 Fed. Reg. 70,208, 70,209 (Nov. 17, 2010) ("*Final Results

AR2*"); Issues & Decision Mem., A-570-904, ARP 3–09, at 11-12 (Nov. 9, 2010) ("*Decision

Mem. AR2*").  The Department made this decision upon a finding that Jacobi, a mandatory

---

[10] 19 C.F.R. § 351.212(b)(1) provides that:

> If the Secretary has conducted a review of an antidumping
> order . . . the Secretary normally will calculate an assessment rate
> for each importer of subject merchandise covered by the review.
> The Secretary normally will calculate the assessment rate by
> dividing the dumping margin found on the subject merchandise
> examined by the entered value of such merchandise for normal
> customs duty purposes.  The Secretary then will instruct the
> Customs Service to assess antidumping duties by applying the
> assessment rate to the entered value of the merchandise.

19 C.F.R. § 351.212(b)(1).

respondent and the largest Chinese exporter of subject merchandise in the second POR, was

absorbing antidumping duties. *Id.* Specifically, Commerce had found that the domestic net unit

price for Jacobi's entries of certain activated carbon was significantly higher than the entered

value reported to U.S. Customs and Border Protection ("CBP"). *Final Results AR2*, 75 Fed. Reg.

at 70,209; *Decision Mem. AR2* 10-11. Commerce concluded that "while [Jacobi's presumed

duty absorption] does not prevent the Department from calculating appropriate assessment

rates," a per-unit rate is preferable because duty absorption "can result in the undercollection of

duties by CBP if the Department were to issue cash deposit instructions on an *ad valorem* basis."

*Decision Mem. AR2* 11-12. Commerce further determined that this decision would be applied

"to the order in its entirety" such that per-unit rates will "be applied to all respondents in this

particular administrative review and all future reviews of the order." *Id.* at 12.

In the third review, Shanxi DMD filed an administrative case brief challenging the

Department's continued use of a per-unit methodology. Shanxi DMD argued, *inter alia*, that

"the per-unit rate benefit[s] companies who sell premium goods at higher costs while low cost

goods are penalized." *Letter from Shanxi DMD to the Sec'y of Commerce* 9 (June 13, 2011)

(Admin.R.Doc. No. 2201) ("*Shanxi DMD Case Br.*"). Shanxi DMD also submitted that "the

Department does not actually resolve the issue at assessment because the Separate Rate

Companies are not assessed antidumping duty margins based on their own data," and that,

therefore, there is "no rationale" for deviating from the normal practice of establishing the

assessment rate as an *ad valorem* rate. *Id.*

In the Final Results, Commerce continued to apply per-unit assessment and cash deposit

rates to all respondents, whether or not individually examined. *Final Results*, 76 Fed. Reg.

at 67,145. As support for this decision, the Department, referencing its Decision Memorandum

from the second administrative review, stated that "it would be extremely burdensome to

determine whether to apply an *ad valorem* or a per-unit rate on a company-specific basis," and

that "[t]he change in methodology to per-unit assessment rates will not negatively impact these

companies because the total duties due will not change; they will only be allocated over quantity

instead of over entered value." *Decision Mem.* 7 (quoting *Decision Mem. AR2* 12) (internal

quotations omitted).  In response to Shanxi DMD's objections, Commerce stated in the Decision

Memorandum that Shanxi DMD failed to provide any record evidence to rebut the presumption

of continued underselling by Jacobi or to support its claim that the per-unit methodology unfairly

penalizes companies that sell more low-cost subject merchandise. *Id.* at 8.

Shanxi DMD claims that it was unlawful for Commerce to assign it a per-unit assessment

and cash deposit rate in the third administrative review, invoking the same grounds stated in its

case brief.  Shanxi DMD Rule 56.2 Mem. 17-25.  The court agrees, concluding that the decision

to assign a per-unit margin is unlawful in three respects and must be remanded to the

Department.

First, Commerce impermissibly grounded its decision in a finding of duty absorption that

not only pertained solely to Jacobi but also pertained to data from a previous review. *Decision*

*Mem.* 7-8 (stating that Jacobi's "behavior was the basis for the Department to use per-unit

assessment rates" in the Final Results of the previous (second) administrative review).

Commerce did not find that Shanxi DMD had engaged in the practice of duty absorption, and it

failed to base its decision to assign Shanxi DMD a per-unit rate based on findings of fact

grounded in the record of the third review.  Second, Commerce attempted to justify its decision

upon a finding that Shanxi DMD would not be prejudiced in any way by a per-unit rate. *Id.* at 7

(citations omitted) (stating that the "change in methodology to per-unit assessment rates will not

negatively impact [separate rate] companies because the total duties due will not change; they will only be allocated over quantity instead of over entered value"). The court is aware of no evidence on the record of the third review to support a finding that importers of Shanxi DMD's subject merchandise will not, under any circumstances, pay higher deposits and not be assessed higher duties than would occur under an *ad valorem* assessment rate.

Third, Commerce found, without an adequate evidentiary foundation, that "it would be extremely burdensome to determine whether to apply an ad valorem or a per-unit rate on a company-specific basis." *Decision Mem.* 7 (citations omitted). The court fails to see why determining Shanxi DMD's rate as an *ad valorem* rate would impose a significant burden. Even if some burden resulted, that burden would not justify a decision that is unsupported by findings of fact grounded in the record of the third review.

Defendant supports the Department's determination, arguing that the plain language of the statute, 19 U.S.C. § 1673e(a)(1), and the accompanying regulation, 19 C.F.R. § 351.212(b)(1), do not require Commerce to calculate assessment and cash deposit rates in a particular manner or limit per-unit rates to particular factual circumstances. Def.'s Resp. 36-37. According to Defendant, Commerce acted within its discretion in the second administrative review when it made the global change to per-unit assessment and cash deposit rates and continued to "properly follow[] its practice" in doing the same in the third review. *Id.* at 36-37, 40 (citing *Decision Mem.* 7-8). Defendant also points to several Court of Appeals decisions upholding Commerce's departure from the *ad valorem* methodology under certain circumstances. *Id.* at 36-37 (citing *Koyo Seiko Co. v. United States*, 258 F.3d 1340 (Fed. Cir. 2001); *Thai Pineapple Canning Indus. v. United States*, 273 F.3d 1077 (Fed. Cir. 2001)).

Defendant's arguments are unconvincing.  The cases upon which defendant relies do not establish the principle that Commerce has unfettered discretion to apply per-unit cash deposit and assessment rates.  To the contrary, the Department's discretion is not so broad as to sustain an arbitrary decision to apply a per-unit rate to Shanxi DMD, one that was not grounded in any findings pertinent to Shanxi DMD or any findings supported by evidence in the third review.  Finally, defendant's argument that Commerce properly followed its "practice" is unavailing.  The "normal" method established by the regulation, 19 C.F.R. § 351.212(b)(1), is to determine *ad valorem* assessment rates.  Here, Commerce departed from the normal practice and did so in a way that was arbitrary with respect to Shanxi DMD.

### III.  CONCLUSION AND ORDER

For the reasons discussed above, the court concludes that: (1) Commerce must reconsider and redetermine the surrogate values it applied to CCT's carbonized materials and coal and fines by-products; (2) Commerce must reconsider its method of determining the margins for Shanxi DMD, BPAC, and GHC, respectively, and redetermine those margins; and (3) Commerce must reconsider its assignment of a per-unit cash deposit and assessment rate as applied to Shanxi DMD.

Upon consideration of all papers and proceedings in this case and upon due deliberation, it is hereby

**ORDERED** that the Motion for Leave to File Response in Opposition to Defendant's Request for Voluntary Partial Remand, filed September 25, 2012, ECF No. 67, by Defendant-Intervenor Calgon Carbon (Tianjin) Co., Ltd. ("CCT") be, and hereby is, granted, and that the accompanying Memorandum in Opposition to Defendant's Request for Voluntary Remand, be, and hereby is, deemed filed on September 25, 2012; it is further

**ORDERED** that *Certain Activated Carbon from the People's Republic of China: Final Results and Partial Rescission of Third Antidumping Duty Administrative Review*, 76 Fed. Reg. 67,142 (Oct. 31, 2011), be, and hereby is, remanded to the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") for reconsideration and redetermination in accordance with this Opinion and Order; it is further

  **ORDERED** that Commerce must redetermine, in accordance with this Opinion and Order, the surrogate values that it applied to CCT's carbonized materials and coal and fines by-products; it is further

  **ORDERED** that Commerce must reconsider its method of determining the margins for Shanxi DMD Corporation ("Shanxi DMD"), Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd., and Beijing Pacific Activated Carbon Products Company, Ltd., and redetermine those margins in accordance with this Opinion and Order; it is further

  **ORDERED** that Commerce shall reconsider its decision to assign a per-unit cash deposit and assessment rate to Shanxi DMD and redetermine that rate in accordance with this Opinion and Order; and it is further

  **ORDERED** that Commerce shall file its remand redetermination within ninety (90) days of the date of this Opinion and Order, that each plaintiff and defendant-intervenor shall have thirty (30) days from the filing of the remand redetermination in which to file with the court comments on the remand redetermination, and that defendant shall have fifteen (15) days from the date of the last filing of such comments in which to file with the court any responses to the comments of other parties.


          /s/ Timothy C. Stanceu
          Timothy C. Stanceu
          Judge


Dated: August 15, 2013
   New York, New York